**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 04-1649**

─────────────

DARLENE M. THOMAS,

Plaintiff - Appellant,

versus

SIEMENS VDO AUTOMOTIVE CORPORATION;
INTERNATIONAL ASSOCIATION OF MACHINISTS AND
AEROSPACE WORKERS, Lodge No. 2461 of District
Lodge 74, AFL-CIO,

Defendants - Appellees.

─────────────

Appeal from the United States District Court for the Eastern
District of Virginia, at Richmond.  Robert E. Payne, District
Judge.  (CA-03-680-3)

─────────────

Argued:  May 26, 2005            Decided:  August 9, 2005

─────────────

Before WILLIAMS and SHEDD, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

─────────────

Affirmed by unpublished per curiam opinion.

─────────────

**ARGUED:** David Raymond Simonsen, Jr., Richmond, Virginia, for
Appellant.  Dana Lewis Rust, MCGUIREWOODS, L.L.P., Richmond,
Virginia; James J. Vergara, Jr., VERGARA & ASSOCIATES, Hopewell,
Virginia, for Appellees.  **ON BRIEF:** Michele L. Settle, Jennifer M.
Campbell, MCGUIREWOODS, L.L.P., Richmond, Virginia, for Appellee
Siemens VDO Automotive Corporation.

─────────────

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Darlene Thomas (Thomas) filed this hybrid action under § 301 of the Labor-Management Relations Act of 1947, 29 U.S.C. § 185, against Siemens VDO Automotive Corp (Siemens) and the International Association of Machinists and Aerospace Workers, Lodge No. 2461 of District Lodge 74, AFL-CIO (the Union). Thomas claims that Siemens discharged her from employment without just cause in violation of the applicable collective bargaining agreement. She also claims that the Union breached its duty to her of fair representation by not challenging her discharge through arbitration. After full discovery, the district court granted summary judgment in favor of Siemens and the Union. Thomas timely appealed. We affirm.

## I.

A. Background.

Siemens manufactures fuel injectors and fuel assemblies for automotive manufacturers and suppliers at its plant in Newport News, Virginia. The Union has represented the hourly production and maintenance workers at Siemens' Newport News plant since 1971.

At all times relevant to this case, Siemens and the Union were parties to a collective bargaining agreement (the CBA), with the Union maintaining an office on-site at Siemens' Newport News plant. Under the "Management Rights" clause of the CBA, Siemens has the right to discharge Union employees "for proper and just cause."

(J.A. 65).  If Siemens suspends or discharges an employee, the Union, pursuant to the CBA, may file a grievance on the employee's behalf.

The CBA sets forth a three-step grievance procedure that, after the third step, may culminate in final and binding arbitration.  The CBA, however, does not require arbitration in every case; rather, the Union has exclusive control over which employee grievances will be prosecuted through arbitration.  An individual employee has no right or ability to arbitrate a grievance without the approval and support of the Union.

On April 15, 2003, Siemens discharged Thomas for violating its strict policy against violence in the workplace on March 28, 2003. Such policy provides that "[v]iolence, threats of violence, . . . intimidation, aggressive or other disruptive behavior will not be tolerated within SVAC."  (J.A. 123).  It states further that:

> Reports of all violent or threatening behavior will be taken seriously and dealt with appropriately. . . .  If an investigation concludes that an employee has committed violent or threatening behavior, SVAC will take prompt, appropriate actions, including disciplinary action that could include termination.

Id.  Thomas admits that she was required to comply with Siemens' strict policy against violence in the workplace.

B.  Details of Events Leading To Thomas' Discharge.

On Friday, March 28, 2003, Thomas arrived for work at approximately 6:45 a.m.  After clocking-in, Thomas learned that several of her Union co-workers, including Nancy Vance, Linwood Sykes, and Charlotte Williamson, were distributing a notice to night-shift employees who had just finished their shifts, which notice announced that a petition, requesting a revote on a previously defeated proposal to make the Newport News plant a continuous shift operation, had been signed by sixty-five percent of Union members at the plant.[1]  Maggie Taylor, Thomas' friend of eighteen years and fellow Union co-worker, then showed Thomas a copy of the notice.  Maggie Taylor, like Thomas, opposed a revote on the Continuous Shift MOA.

Upset that Union members were distributing Union materials during work time in apparent violation of the CBA, at approximately 7:00 a.m., Thomas, Maggie Taylor, and Helen Blain, another employee opposed to a revote on the Continuous Shift MOA, collectively proceeded to and entered the Union's on-site office in order to complain to a Union representative.  Two other employees, Lillian Cooter and Marion Williams, and Union President Byron Carter (Union

---

[1]On March 20, 2003, Union members at Siemens' Newport News plant had voted on a proposed memorandum of agreement between the Union and Siemens to modify the CBA in order to make the Newport News plant a continuous shift operation (the Continuous Shift MOA). The Union rejected the Continuous Shift MOA by a close vote of 161 to 155.  Thomas had voted to reject the Continuous Shift MOA and was opposed to a revote.

- 5 -

President Carter), were already present in the Union's on-site office when Thomas and the others arrived. Notably, Lillian Cooter did not know Thomas, Maggie Taylor, or Helen Blain.

Once in the Union's on-site office, Thomas stood near its half-glass door, facing Union President Carter's desk. In the meantime, employees Nancy Vance, Charlotte Williamson, and Linwood Sykes proceeded to the Union's on-site office to return extra copies of the notice.

What happened next is the subject of some dispute. According to Nancy Vance, she opened the office door a few inches and asked Union President Carter if he was busy. Believing that he signaled her to enter, Nancy Vance opened the door ten more inches. Then, testified Nancy Vance in deposition, Thomas "poked her head around the door and saw me standing there [and] took her body and shoved [the door] against me." (J.A. 480). Nancy Vance further testified that Thomas threw her shoulder into the door violently in an attempt to prevent her from entering the office. She further testified:

> At that point a contact had hit me in the elbow and just shot the pain through my arm. I slid back. My foot got trapped in the door. And [Thomas] continuously tried to shove me out of the way, out of the room, which I really never got a chance to go into until my foot popped loose and I actually went back into Charlotte [Williamson].

_Id._ In various depositions and interviews, Lillian Cooter, Linwood Sykes, Charlotte Williamson, and Union President Carter corroborated Nancy Vance's version of events.

Not surprisingly, Thomas disputes Nancy Vance's version of the incident. Thomas claims that Nancy Vance aggressively opened the door into her, causing her pain. Thomas admits that she immediately responded by pushing the door shut with her arm and hip, but denies that she did so violently or with the intent to hurt Nancy Vance.

In an April 3, 2003 letter to Mike Lindsey, Siemens' human resource specialist (HRS Lindsey), Maggie Taylor generally corroborated Thomas' version of events. Helen Blain did the same in an undated letter to Mike Lindsey.

Immediately after the incident, Nancy Vance complained about Thomas' behavior to a Siemens supervisor and HRS Lindsey. Nancy Vance also promptly reported her injury to the plant nurse and filed criminal assault and battery charges against Thomas. In addition, Nancy Vance, who also belonged to the Union, filed a grievance against Siemens under the CBA, alleging that Siemens had failed to provide her with a violence-free workplace by permitting Thomas to assault her in the plant.

In contrast, Thomas did not make a complaint to Siemens' Human Resources Department about the door incident, nor did she seek

treatment from the plant nurse or file criminal charges. Rather, Thomas left the plant because she said she had a headache.

HRS Lindsey immediately began investigating Nancy Vance's complaint. He interviewed available witnesses, including Union President Carter and Linwood Sykes. Union President Carter confirmed that Thomas had forcefully tried to slam the door shut on Nancy Vance, striking her and "throwing her body weight against the door, maybe four or five times." (J.A. 135). Linwood Sykes also reported that Thomas had slammed the door into Nancy Vance, striking her on the arm and catching her foot in the door. HRS Lindsey attempted to interview Thomas, but learned that she had already left the plant.

After interviewing the witnesses present in the plant, HRS Lindsey preliminarily concluded that Thomas was the aggressor in the door incident and that she had repeatedly, forcefully, and intentionally slammed the Union's on-site office door into Nancy Vance. Accordingly, HRS Lindsey suspended Thomas pending the completion of his investigation. On Sunday, March 30, 2003, HRS Lindsey contacted Thomas at home and notified her that she was suspended pending completion of his investigation.

Homer Tipton, the Assistant Directing Business Representative for the Union, immediately filed a grievance on Thomas' behalf challenging her suspension. The grievance requested that Thomas be

reinstated and made whole.  Thomas admits that Homer Tipton properly filed this grievance on her behalf.

HRS Lindsey continued his investigation by interviewing Thomas on Wednesday, April 2, 2003.  Union Steward Marion Williams and Union Vice President Bernard Banks (Union Vice President Banks) represented Thomas during the interview.  Thomas admitted pushing the office door shut with her arm and hip, but denied hitting Nancy Vance with the door.

HRS Lindsey also met with and obtained statements from Lillian Cooter and Charlotte Williamson.  Helen Blain and Maggie Taylor provided HRS Lindsey with statements indicating that the office door made contact with Thomas and that Thomas then pushed the door closed.

After completing the investigation, HRS Lindsey concluded that the weight of the evidence established that Thomas had exhibited violent, threatening, and intimidating behavior that could have resulted in serious injury to Nancy Vance.  Accordingly, HRS Lindsey recommended to Siemens' Human Resources Director Russ Sewell (HRD Sewell) that Thomas be discharged.

HRD Sewell agreed and, on April 15, 2003, Thomas' suspension was converted to a discharge.  In reaching this decision, HRD Sewell relied primarily on the testimony of Union President Carter, who had the best view of what occurred.  Union President Carter believed that Thomas had intentionally tried to harm Nancy Vance

because, according to him, Thomas repeatedly slammed the door on Nancy Vance.  HRD Sewell also relied on the testimony of Lillian Cooter, who HRD Sewell believed was particularly reliable because she did not know the parties in the altercation and had no cause for bias.

When Homer Tipton learned that Thomas had been discharged, he immediately converted the Union's grievance of Thomas' suspension to cover her discharge.  Homer Tipton then began an independent Union investigation, obtaining statements and interviewing witnesses.  Homer Tipton interviewed Thomas, Lillian Cooter, Union President Carter, Helen Blain, Marion Williams, Charlotte Williamson, and Maggie Taylor.

According to Homer Tipton, in two separate interviews, Maggie Taylor told him that she yelled to Thomas "No Darlene," (J.A. 180), and "'stop,'" (J.A. 442), because she was concerned about Thomas trying to hurt Nancy Vance.[2]  Union Vice President Banks, who was present during Homer Tipton's first interview with Maggie Taylor, confirmed that Maggie Taylor made these statements.  Union Directing Business Representative Larry Young (Union Directing Business Representative Young) was present during the second interview and confirmed that Maggie Taylor made these statements.

---

[2]In deposition testimony in the present case, Maggie Taylor denies that she told Thomas "no" or "stop" and denies that she told Homer Tipton during the interviews that she had uttered such words at the time of the door slamming incident.

As his investigation progressed, Homer Tipton became concerned about the impact of multiple union eyewitnesses, including the Union President, testifying against Thomas in an arbitration. Despite his concerns, Homer Tipton dutifully represented Thomas throughout the three-step prearbitration grievance process. This process culminated in the third-step meeting between Union and Siemens officials.[3] (J.A. 433-34).

Homer Tipton asserted in the third-step meeting that Thomas had not intended any violent action or harm to Nancy Vance. He also claimed that Nancy Vance was at fault because she had actually pushed the door into Thomas. Homer Tipton further argued that Siemens should not discharge Thomas because it had not discharged Nancy Vance. In addition, Homer Tipton argued that Thomas' discipline was not consistent with discipline imposed upon other employees.

Thomas admits that she wanted Homer Tipton to make each of the arguments he presented at the third-step meeting. There is also no dispute that Thomas was able to personally make the additional argument that Union President Carter was not a disinterested witness because he supported the Continuous Shift MOA and a revote, but she did not. Thomas also claimed injury by being struck by the

_____

[3]The CBA provides that if the parties cannot resolve the grievance following the third-step meeting, the Union can issue a notice of intent to arbitrate.

- 11 -

door when opened by Nancy Vance.  Finally, Thomas stated during the third-step meeting:  "'I don't believe in conflict.'"  (J.A. 425).

HRD Sewell upheld Thomas' discharge.  Significant in his decision to do so were the several eye-witness statements in favor of Nancy Vance's version of events, including the eye-witness statement by Union President Carter.  Additionally, HRD Sewell did not find Thomas' claim of injury to be credible given that the force of a door being opened twelve inches is minimal and the fact that Thomas had ample opportunity to report any injury she sustained in the incident to the company's Return to Work Coordinator (a registered nurse) or the company's medical clinic prior to her leaving the plant on the day of the incident, but did not do so.  Finally, in his written decision, HRD Sewell emphasized that although the door slamming incident alone constituted sufficient cause to discharge Thomas, prior violent incidents involving Thomas served as relevant background and directly refuted Thomas' statement that she did not believe in conflict.

One such violent incident occurred in 1996, when Thomas grabbed co-worker Louise Mitchell by the shirt during a Union meeting and told her that "if she ever told [her, referring to Thomas,] to shut the f**k up again, [she would] beat the sh** out of her . . . ."  (J.A. 207).  When asked during her deposition in the present case whether she considered her statement a "threat," Thomas testified "[no] I didn't. . . . I considered it a warning of

me telling her not to do it again, and a promise that if she did do it again, that that's what I was going to do."  (J.A. 331).

The co-worker filed criminal charges against Thomas and a civil suit against her in connection with the incident.  In the subsequent criminal proceeding, the judge found sufficient evidence to convict Thomas.  Union members also filed internal Union charges against Thomas based on the assault and battery, which resulted in Thomas being fined and prohibited from running for Union office for three years.

HRD Sewell's final written decision following the third-step meeting also described another violent incident involving Thomas, which incident occurred approximately one month prior to the door slamming incident on March 28, 2003.  In February 2003, an employee working in the same department as Thomas requested that she be moved away from Thomas' work area because Thomas told her:  "'I'll get you when no one's around.  I'll f**k you up, you white b**ch.'" (J.A. 425).

Following HRD Sewell's adverse decision, Homer Tipton decided not to arbitrate Thomas' discharge grievance.  When determining whether to arbitrate a grievance, Homer Tipton considers factors such as the merits of the grievance, if it is economically viable to bring the grievance to arbitration and whether the arbitration will have any broader, beneficial impact on other union employees.  According to Homer Tipton, Siemens had a strong case against Thomas

which would result in an unsuccessful arbitration of Thomas' grievance. Of particular importance in his decision not to arbitrate Thomas' grievance were the multiple Union eyewitnesses, including the Union's president, who would testify against Thomas. Indeed, Homer Tipton testified that he had lost several arbitrations with Siemens specifically because Union employees had testified against Union grievants. At the time Homer Tipton decided not to arbitrate Thomas' discharge grievance, the criminal charges against Thomas in connection with the door slamming incident had not yet been resolved.

On August 11, 2003, Darlene Thomas filed the present hybrid § 301 action, 29 U.S.C. § 185, against Siemens for breach of the CBA and against the Union for breach of its duty of fair representation. Thomas alleged five counts in her complaint. Following the completion of discovery, Siemens and the Union moved for summary judgment on all counts. The district court granted the motion in toto. Thomas moved for reconsideration, but the district court denied the motion.

Thomas has only appealed the district court's grant of summary judgment with respect to Counts One and Two. In Count One, Thomas alleged that Siemens breached the CBA by discharging her without proper and just cause. In Count Two, Thomas alleged that the Union breached its duty of fair representation by not arbitrating her discharge grievance.

## II.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A mere scintilla of evidence in support of the plaintiff's position is insufficient to stave off summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Moreover, "[c]onclusory or speculative allegations do not suffice . . . ." to stave off a properly made motion for summary judgment. Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002).

We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to Thomas, the nonmoving party. Kubicko v. Ogden Logistics Servs., 181 F.3d 544, 551 (4th Cir. 1999).

## III.

Thomas contends the district court erred in granting summary judgment in favor of Siemens with respect to Count One and in favor of the Union with respect to Count Two.

- 15 -

"This is a so-called 'hybrid 301' action, where in order to prevail on the merits against either party, an employee must prove *both* 1) that the union breached its duty of fair representation and 2) that his employer violated the collective bargaining agreement." Thompson v. Aluminum Co. of America, 276 F.3d 651, 656 (4th Cir. 2002). As a hybrid action under § 301, a cause of action will lie against Siemens only if the Union breached its duty of fair representation. Id. "Accordingly, an employee must prevail upon his unfair representation claim before he may even litigate the merits of his § 301 claim against the employer." Id. at 656-67 (internal quotation marks omitted).

"It is well established that unions, as exclusive bargaining agents in the negotiation, administration and enforcement of collective bargaining agreements, have an implicit duty 'to serve the interests of all members without hostility or discrimination toward any, to exercise [their] discretion with complete good faith and honesty, and to avoid arbitrary conduct.'" Id. at 657 (quoting Vaca v. Sipes, 386 U.S. 171, 177 (1967)) (alteration in original). Accordingly, a union is found to have breached its duty of fair representation if it exercised its discretion "arbitrarily, discriminatorily or in bad faith . . . ." Id. at 657. See also Smith v. Local 7898, United Steelworkers of Am., 834 F.2d 93, 96 (4th Cir. 1987).

On appeal, Thomas does not claim that the Union exercised its discretion either arbitrarily or discriminatorily in deciding not to arbitrate her discharge grievance. Rather, Thomas claims that the Union exercised its discretion in bad faith in deciding not to arbitrate her discharge grievance.

An analysis of whether a union exercised its discretion in bad faith focuses upon the subjective motivation of the relevant union decision maker or makers. Thompson, 276 F.3d at 658. For purposes of this appeal, Taylor does not dispute that Homer Tipton alone made the decision on behalf of the Union not to arbitrate her discharge grievance. Accordingly, our analysis focuses upon the subjective motivation of Homer Tipton in deciding not to arbitrate Thomas' discharge grievance.

The primary evidence proffered by Thomas to carry her burden of proving by a preponderance of the evidence that the Union, via Homer Tipton, subjectively acted in bad faith in exercising its discretion not to arbitrate her discharge grievance is the deposition testimony of Maggie Taylor denying that she told Homer Tipton in two separate interviews that she yelled to Thomas "No Darlene," (J.A. 180), and "'stop,'" (J.A. 442), because she was concerned about Thomas trying to hurt Nancy Vance. As Thomas' argument goes, because Maggie Taylor denies having made these statements, Homer Tipton must have been lying when he testified otherwise during his deposition in the present case, and a

reasonable jury could infer from such lying that bad faith motivated him not to arbitrate Thomas' discharge grievance. As evidence of Union bad faith against her in general, Thomas points out that Union Vice President Banks and Union Directing Business Representative Young have corroborated Homer Tipton regarding the alleged Maggie Taylor statements at issue.

Following our careful review of all record evidence, in the light most favorable to Thomas, we conclude that Thomas has not carried her burden of proffering sufficient evidence to prove by a preponderance of the evidence that the Union subjectively acted in bad faith in deciding not to arbitrate her discharge grievance. Even assuming arguendo that Homer Tipton, Union Vice President Banks, and Union Directing Business Representative Young were somehow dishonest in reporting that Maggie Taylor made the "No Darlene--stop" statements during her interviews, the record discloses no evidence establishing a motive for such dishonesty or lying, as Thomas posits, on what was actually a matter collateral to Homer Tipton's decision not to arbitrate Thomas' discharge grievance. Accordingly, a jury would necessarily have to engage in rank speculation to find that bad faith motivated Homer Tipton to decide not to arbitrate Thomas' discharge grievance.

The following excerpt from Homer Tipton's uncontradicted affidavit makes clear that he believed Siemens had a strong case without regard to any statements by Maggie Taylor that she yelled

at Thomas to stop shutting the door because she feared Thomas wanted to go after Nancy Vance:

> 15. After the third step meeting, Siemens upheld the decision to terminate. I was now faced with deciding whether to arbitrate the grievance.

> 16. This decision is mine and mine alone. My job is to make the decision based on a number of factors, the foremost being the merit of the case. It is not appropriate to arbitrate each and every grievance regardless of merit. . . .

> <u>I knew from experience that Siemens had a strong case.</u> I felt that if they discovered Maggie Taylor's take on the facts, it would only get stronger. I decided not to arbitrate the Thomas grievance because in my opinion the merits of her case could not support a favorable award at arbitration.

(J.A. 442-44) (emphasis added).

Indeed, Siemens had an overwhelmingly strong case for discharge against Thomas regardless of what statements Maggie Taylor actually made during the March 28th incident. Several Union members, including the Union's president, corroborated Nancy Vance's version of events. Of these witnesses, the statements of Lillian Cooter were extremely damaging to Thomas' case because Lillian Cooter had no allegiance to Thomas or Nancy Vance. Additionally, Thomas had a well established history of violence against coworkers. Finally, the undisputed evidence in the record discloses that Homer Tipton conducted a thorough investigation of the March 28th incident on behalf of the Union and that he thoroughly and fairly represented Thomas in the first three steps of her grievance process.

- 19 -

In short, the record does not contain sufficient evidence, when viewed in the light most favorable to Thomas, to create a triable issue of fact that the Union, via Homer Tipton, exercised its discretion not to arbitrate her discharge grievance in bad faith. Because Thomas cannot prevail upon her unfair representation claim against the Union, as a matter of law, she cannot prevail upon her breach of the CBA claim against Siemens. Thompson, 276 F.3d at 656-57. Accordingly, we affirm the judgment entered by the district court in favor of Siemens and the Union.

AFFIRMED